United States v. Chollet Good morning, and may it please the court. The district court literally amended the indictment, constructively amended the indictment, abandoned this circuit's longstanding precedent that a literally true statement on a government form cannot be the basis of a criminally false conviction, and impermissibly admitted evidence of Mr. Cohn's prior criminal tax conviction from 2002. You know, you're relying on that Seventh Circuit case for the literal truth, and as you know, the Seventh Circuit case held that a space on the form called for a W-2 income, and the court said that was literally true, put on the W-2 income, and other income was not put in. And so the court recognized there was a problem there. Yours is a deduction for business expenses that were never made, just totally fraudulent, made up according to the jury's finding. And to me, that's a non-starter. If you want to spend time on that, you can go ahead. I'm speaking only for myself, but the form here put in deductions, business expenses for intellectual property and fees for services that were never provided, and at least that's what the record shows. And so we're not here to try to justify a fraudulent entry with a literal truth. There's nothing truth about it. And I appreciate the court's comments. I would very, very briefly respectfully push back on the interpretation of Reynolds, because each of the 72062 counts in this case only alleged by explicit line number in the indictment the total income line, which is exactly analogous. But it was made up of a fraudulent deduction. The income was reduced by business expenses that were fraudulent, that did not exist. There's no literal truth about something that didn't exist. Your Honor, I don't believe that the record supports that conclusion, especially because the jury was actually given a redacted indictment and not actually required to find what the Fifth Amendment required the jury to find, which was that line, that the total income line, line 22 on most of these tax returns, was in fact literally false. Well, were lines 7 through 21 literally true? Your Honor, they were not charged, but to answer that- They weren't true, were they? That was the fraudulent part. Our position, Your Honor, we would dispute that, but to answer the court's question, all the jury was required to find was that the total income line was false. And to answer this court's question, Your Honor, as to whether the other lines, essentially the baked-in numbers, were literally true, the court would have to look at, and the jury would have to look at, partnership tax returns and other aspects of 1065. I mean, it just seems to me like you're saying line 22 is literally true because the math is accurate. You're saying 2 plus 2 literally equals 4. But if the 2 and the other 2 are fraudulent, then it can't be true. The whole thing is not true. Your Honor, I believe that based on the language of the form, which is what controls, that's true with this court's precedent in Baer, in Good, in Sarwari, then based on the language of the form, the government could have charged Mr. Cohn with line 7 or line 12 or line 14, whatever it may be. The court charged him with 7206, subsection 2. Correct, Your Honor. And it's a very broad provision. It includes all of what you're talking about. But the point is the form did not call for a fraudulent entry. It called for a truthful entry of business expenses supported as the tax code requires. And, Your Honor, I appreciate where the court's coming from, and I'm going to pivot to a different issue, but as a practical matter, all I would say and all I would respectfully push back on is that under the Fifth Amendment grand jury clause, what's actually alleged in the indictment shouldn't shift. In other words, if line 22 is what's alleged in the indictment, the jury shouldn't be allowed to convict on line 7 or line 12. The threshold issue before this court, though, is whether there was authority to prosecute in the first case, in the first place. 28 CFR.70 expressly stated that criminal prosecutions shall be supervised by the assistant attorney general of the tax division. That undisputedly did not happen here. There was no assistant attorney general properly nominated and confirmed by the Senate pursuant to Article 2, Section 2 of the Constitution. We commonly call it the appointments clause. Take me factually through the facts. I had a little trouble. I did dig out, I think, the facts on this, but you can start with the fact that the attorney general under Section 510 is given a delegation authority, and that in this case there's a document from the attorney general delegating responsibility for the tax codes to various people, and acting at AAG in tax, and there's one from the AAG in tax delegating it to Goldberg, and Goldberg signing the authorization. Now I don't know where, there's a missed link there that you think there is, but it seems to me the record is pretty clear on this. Two responses, Your Honor. First of all, as a practical matter, .70 we believe is non-delegable, and that's a CFR regulation that expressly gave the authority to a principal officer, to the assistant attorney general. Hold it. Let's go back to more fundamentals. 510 gives the attorney general the authority right to delegate. You're not arguing that Section 510 is unconstitutional, are you? No, Your Honor, I'm not. Okay. 510 gives the attorney general the right to delegate, and then there is a document in there where the attorney general at the time delegated the responsibility to the AAG, this assistant attorney general in tax, the responsibility acting assistant attorney general, and there's a document where he appoints the DAAG for tax, which would happen to be Goldberg, and Goldberg then signed the authorization. The constitutional problem there, Your Honor, is that to the extent that this court were to interpret, I believe it was acting tax assistant attorney general John DeSico's delegation, so to speak, as a permanent delegation, which is the only way to interpret it, there hasn't been an assistant attorney general properly nominated and confirmed by the Senate since Cathy Keneally left in June of 2014. The authority was granted to the attorney general legally, correct? Congress granted the authority to the attorney general, however— All right, now that's not an appointments problem. Now we're within the Department of Justice, and there's nothing with the appointments problem. Now the attorney general then made a delegation in this case, and he made it with the authority to the acting attorney general in charge of tax. Now that's not an improper delegation, is it? The problem, Your Honor, is that under— I said, is that an improper delegation? It's not an improper delegation from the attorney general— To the AAG, right? To the acting AAG. Right. Now the acting AAG made a delegation to DAAG Goldberg, right? Yes, Your Honor, however— Okay, was that unauthorized? I believe that that was unconstitutional because it creates a permanent delegation to a non-presidentially nominated Senate-confirmed office holder, which does— There's nothing in 510 that says a delegation has to be to a confirmed person. The only person level confirmed is the assistant attorney generals. After that, delegation goes down to the deputy assistant attorney general and others, and they're not confirmed by the Senate. This operation is so big, they have to delegate. And they did delegate, and they carefully delegated here. Your Honor, under the Fort Stewart case— and I say my time is up, but if I may answer the court's question— Yes, of course. Under the Fort Stewart case, agencies have to follow their own regulations, and that's what's missing from, I believe, Your Honor's analysis, if I could respectfully push back there. Because as a practical matter, there's a mandatory supervision authority, Directive 128, to the extent that this court even considers that having any sort of legal significance in this analysis. The Department of Justice in this case didn't even follow, as it applies to approval of search warrants— I'm sorry, of grand jury subpoenas, as it applies to this delegation. That's a new argument, right? That wasn't raised in your— below or in the opening? We did, Your Honor, raise it in the reply brief in response to an argument made. That's a new argument. I would respectfully say that it's a continuation of essentially responding to whether or not— That's not. It's a totally different problem to say that they didn't get the subpoenas correctly. And that's not even the prosecution— In some of these directives, certain authority is reserved to the AAG, and other authority is delegated to the DAG. Yes, Your Honor, but— And you're— I mean, we can't— you can't lump it all together. Well, Your Honor, what I'm saying, and I appreciate where the court's coming from, is that to the extent that the government is using Directive 128 as the magic bullet that essentially justifies everything they've done here constitutionally, they haven't even followed Directive 128. They did. They delegated the authority to prosecute attorneys for taxes to the DAAG. And they reserved— the AAG reserved the right to subpoena attorneys, which is a different problem. We have a prosecution here. And the prosecution of attorneys was delegated. Your Honor, there's two different powers. There's an added layer of prosecuting attorneys, but there's a consistent non-delegable power to supervise that is not delegable by the AAG of tax to prosecute anybody for a tax crime. And that's where the distinction with a difference occurs here. If I may, I see that I'm out of time. Thank you, Your Honor. Yeah. We'll hear from Mr. Dickhouse. Thank you, Your Honors, and may it please the Court, Carl Dickhouse, I represent, to your question, Judge Niemeyer, Liza Chollet. Chollet? Yes. A French pronunciation? Maybe? St. Louis is home to all the French and Germans, so it makes it hard to know how to pronounce anything. Well, the Germans will pronounce the T for sure. Exactly. It is a French name. And I want to address perhaps one of the more critical issues with regard to Ms. Chollet, which is the lack of venue. And specifically, in 1998 and 1999, the U.S. Supreme Court decided the Cabrales case and the Rodriguez-Moreno case, and this Court shortly thereafter decided the Bounds case, where you held that, consistent with the Supreme Court's rulings, you had to look at the essential conduct elements of the alleged crime, which you got by looking at the verbs that define the crime, if it were not defined in terms of the fact that 7602 is defined in terms of the actions taken, not the effects of those actions, and that the government was then required to prove by preponderance of the evidence that those actions took place in the Western District of North Carolina, wherever the trial was done. Here, there is no evidence offered by the government at trial about the essential conduct elements or their occurrence. Let me ask you this. I understand your whole argument, and I've looked at the statute, and the statute talks about anyone who procures or advises the preparation or presentation of any matter relating to the taxes, but the key word would be procures information for preparing the tax returns, and it seemed to me that the evidence showed that Mr. Simmons or Ms. Chollet procured information from their clients in North Carolina to prepare tax returns. Why wouldn't that be an element, a conduct element there? Well, there's two things, if I may, Your Honor. I mean, it's a good question. The first is that there was no procuring done by Ms. Chollet, and this is not charged as a Pinkerton conspiracy. It's just a single substantive case, but Ms. Chollet did not procure. Any procurement that she did took place in the Eastern District of Missouri. There's no allegation she went to North Carolina to do it. The second argument with Mr. Simmons... Did she get the information through Mr. Simmons? It's true that Mr. Simmons' office would gather information from Mr. Simmons' clients and then furnish it to the Cone Partnership. And provide those to Ms. Chollet, right? Well, to the Cone Partnership. Again, the bounds analysis... And where was Mr. Simmons' office? In the Western District of North Carolina. I'm not disputing that, but under the bounds analysis, the government is required to prove for each count as to each defendant. What the government did was say, generally, some information came through North Carolina. The information were all the tax persons involved with it. There were four of them. One from Minnesota, but that information still came through Mr. Simmons. And then the other three from Western North Carolina. And then the LEPRA... Pardon me? The LEPRA returns were from Missouri, but in November... Well, the information was procured in order to prepare the tax returns in Missouri. And the statute is very broad, and it doesn't even have to relate to a tax return. It can only... It can even just relate to tax matters. I mean, it's arising under... In connection with or arising under the tax matters. And it seems to me that it's pretty clear that the information was procured from Western North Carolina through Mr. Simmons' office. And I do understand that. I mean, it's not clear for each count. Obviously, Ms. Chollet did not prepare the returns in each count. The government concedes as much. She prepared seven of the forms 1040. And there was no evidence that she caused this information to be sent from the Western District of North Carolina. There just was no evidence. The government presented no evidence on this. So while it may be reasonable to infer that, the balance structure has a two-part test. Wasn't there also some evidence, at least as to the clients who lived in the Western District, that there was evidence that the Combe Partnership made sure that the clients had an opportunity to look at their returns before they were filed, right? So the returns are sent to the client and they get to review them. That's correct. And I believe under the Sterling decision... Part of assisting in the preparation, perhaps, of the filing. Well, under the Sterling decision, the preparatory acts... That's not an essential conduct element. Elements. But in this case, the preparatory acts are an element of the offense. Procuring information relating to a tax return is part of the offense. Whereas preparation is before there's an element involved. And in this case, not only were the returns reviewed by the... The proposed returns reviews, opposed, but there were also the partnership agreements were in North Carolina, right? Registered in North Carolina? The partnership agreements were registered in Raleigh, which is in the Eastern District. So that wouldn't... And a partnership return, whether it's registered or not, has nothing to do with the preparation of a tax return. I mean, it's related in the conspiracy count. No, it's really... It only has to be in connection with any matter arising under the laws. And that whole scheme was part of the preparation of the tax return. The GE... What do you call it? GEP? The Gain Elimination Plan, the GEP. I understand. But the GEP, first, that was for the preparation of an uncharged tax return. The 1065 partnership returns. The 1065 partnership returns were summarized, placed on a form K-1. The form K-1 is then provided to the preparer of the 1040. The preparer of the 1040, looking at the K-1, cannot tell anything about the uncharged partnership returns. That's the first thing. And the second thing is that in looking at the essential conduct elements and the evidence required for each proof, they made general allegations, which of course would be impossible to refute. They did not demonstrate how she did this. For the venue, you go to the elements of the offense, don't you? It's a two-pronged test that must be done under Bounds and Sterling and Mosby. You have to... You go to the elements of the offense, you take out those verbs, which is the aiding, abetting, preparing, procuring. And it doesn't say procuring information, it says procuring a tax return. Procuring modifies tax return. And then once you've determined the elements, you say where were those committed? Who committed them and where were they committed? Everything that was done by Ms. Chollet was done in the Eastern District of Missouri. Nothing was done in the Western District of North Carolina. And then you have to establish that by preponderance for each count. And here no effort was made. If you look at Sterling, if you look at Mosby, they found venue on certain counts and not on other counts. That could not be done here because no evidence was presented. I see my time is up. But thank you, Your Honor. Yes, sir. Mr. Ellenwood. Thank you. May it please the court. Todd Ellenwood for the government. Given the questions from the bench, I'm actually not sure where to start because you did my job for me. I will start with venue. These are questions. These are not conclusions. We are pressing them on areas where we think there needs to be answers. If there are areas that you have, I would start with venue. The evidence was overwhelming. There are specific documents as to each and every count that they weren't spelled out in closing argument or some such is immaterial. The jury instruction, which was not objected to below or raised on appeal for counts 2 through 22, you must decide whether an act was committed by a defendant or caused to be committed in furtherance of the preparation of filing of the false tax return issue. It includes some examples, one of which is whether a tax return was signed in the Western District. Five of the returns were signed in the district. This was at a time period where most tax returns are electronically filed. But there are five that are signed with a wedding signature by three of them are Mr. Simmons. He lived and worked in the Western District of North Carolina. They were signed by his wife on the same date. That's dispositive evidence as to those. Mr. Bowers was an older gentleman who operated a pharmacy in Jefferson, North Carolina. The evidence showed that if he needed to have printer paper put in, it was going to be Brandy Davis from Mr. Simmons's shop coming over and doing it. It was very, very hands-on care. For example, even if the allegation is that the defendants in order to have venue in the district would have had to reach in and request the information, we have that evidence. Ms. Shillay emailed Brandy. At the time of trial, she was Davis. In the documents, she's Ms. Marlowe. But Ms. Davis, she says to her, I've sent out reminders to almost everyone about 2017 tax info. I think the only ones I need your help with are Greg Bauer. That's the pharmacist. Ms. Davis responds to Ms. Shillay. Here's Shane's in the agency. Shane is Mr. Simmons, so she's sending the information for Mr. Simmons. I couldn't remember if I'd sent it or not. I'm picking Greg Bowers up this afternoon, so I will get it over to you this morning. That's at JA-6114. There were over a thousand exhibits entered into evidence. If you ask me for a specific count, I can tell you what specific document establishes venue. As to the argument for the appointments clause, it fails at every level. The first one is whether 0.70 even requires authorization of tax returns. The language is, the following functions are assigned to and shall be conducted, handled, or supervised by the Assistant Attorney General Tax Division, and it has the first one, I think, is civil tax, and then B, criminal proceedings arising under the Internal Revenue Laws. I would almost think with my opponent's argument, he'd almost be better saying that the AAG is required to conduct and handle every single tax matter in the United States. At least those words are in there. What I really want to point you to is every single regulation for an Assistant Attorney General in the Department of Justice has the identical language. Just scratch out tax and write in criminal, for example. For the criminal division's regulation, which is at 0.55, it says that the following functions are assigned to and shall be conducted, handled, or supervised by the Assistant Attorney General and then it lists all kinds of things, including criminal frauds against the United States, all criminal and civil litigation under the Controlled Substances Act, all immigration. No one has ever alleged that the head of the criminal division has to individually authorize every single drug case. I'm arguing that 0.70 doesn't even require this specific function. If it does, it's delegable. The defendants have made no effort to explain or distinguish how it's black letter law. Every court that has looked at this has said and approved broad delegation of authority. There's nothing about the initial statute, as Judge Niemeyer talked about, or the regulation itself that limit delegation. Can I ask you about an issue opposing counsel didn't get a chance to address yet, but why was it not overly prejudicial to admit evidence of Mr. Cone's prior tax fraud conviction in a tax fraud trial? It was alleged in the indictment because it was part of the fraud structure, that either clients asked about it. If you Google his name, it's the second or third thing that pops up. Either clients would ask about it, or sometimes he would lead with it. Sometimes there's a sword and a shield quality to this. Oh, what was in the indictment was this and that, and the government railroaded me, but sometimes it would be more of a sword. Look what I'm willing to do for my clients. The district court was very careful about this and restricted our use to it to only the things that were false statements that he made, and that we were allowed to get in portions of the indictment through a stipulation that pertained to the specific lies. So that was carefully limited. It's in some ways part of his scheme, meaning he used it so the government would have to, at least in part, talk about that prior tax fraud conviction to tell the story. As an example of that, Your Honor, it's direct evidence of willfulness. Some of it is very extreme, and it's basically, I will not flip on you. It's not even, hey, nothing to see here. In the undercover recording, the undercover says, hey, have you had any trouble with the  This is an interesting tax shelter. Have they questioned it? Mr. Cohn, quote, the only thing you need to know is that I'm fiercely loyal to my clients, and I had a situation about 20 years ago. And then he goes on to provide false statements about it. Did he ultimately, did he stipulate to the admission of this? Yes, our arguments are two. We have the one argument that by opening it, and that's a strategic decision, that by opening with it, the door is open. It's charged conduct as part of the marketing of his GDP. You're getting, yep, there are five different levels on this. I would say he opened with it. But the court had already ruled against him when he opened with it, right? Well, that's consistent with OLER, is that if you, you know, OLER stands for the proposition that if a district court judge rules against you, even if it's wrong, you make the strategic decision if you enter the evidence. The difference here is that OLER was about entering the evidence. So if somebody was on the stand, and you asked the question, that clearly opens the door, and you waive the argument on appeal. The difference here is that opening statement is obviously not evidence.  But three circuits have said it's the same thing. You can waive lots of things in the opening argument. Probably have better arguments, though, than this one. Yep, right. And then the other one was the stipulation, that by stipulating to it, you know, it was an effort to minimize the damage, and it did so. It's not even 404B evidence because it's intrinsic. It was actually part of the charged offense. And there's nothing about it being inappropriately smuggled in, or there's no accusation of that, that, oh, you just reached back and grabbed this old thing and threw it into the indictment. It's squarely part of the scheme to sell the gain elimination plan. And we had at least two clients testify about it and the undercover. There was plentiful evidence as to that one. And then we haven't even gotten to the, I think I've covered two of the prongs that fail for the Appointments Clause argument. But a defendant in this position has to show prejudice. And a lot of the courts, district courts, that's what they start with first. I was actually surprised with how little law I found on this. And a lot of district court judges just start with that. They'll say, like, well, under Costello, a grand jury indicted, and that's enough for it to go to the court. So you haven't shown prejudice, and that's the end of the analysis. Here, the district court judge wanted to be really, really careful. And at the initial hearing, I pushed back on providing lots of our internal materials. We ultimately provided the transmittal form, the actual internal authorization forms for Mr. Hubbard and Mr. Goldberg. So the record was quite fulsome on that. We pushed back and filed it under seal. It eventually was, portions of it were unsealed. There's no argument that been made that there's real prejudice here. There is some confusion kind of in the law that sometimes the structural cases do sound like they are very all-inclusive. But those are virtually all about judicial officers. And I made this argument more fulsomely. I hope you had a chance to read or do have a chance to read the government's bail opposition. And the reason why that's relevant is that some of the cases that came up related to the U.S. attorney's offices were not part of our briefing. And so I was able to respond to it in that. But I also responded to some of these other arguments in more fulsome detail. And whether it is a, if the adjudicator is improperly authorized, so in the Supreme Court cases, it's ALJs or members of the Coast Guard Court of Review. If it's the adjudicator, that is structural error. That's fundamentally different than here where a grand jury indicted. The case went in front of a district court judge with jurisdiction and a jury convicted. There is no prejudice. All right. Anything further? If you don't have any questions, no, your honor. All right. Thank you. All right. We have some rebuttal. I guess to Mr. Gelfand. Thank you, your honor. May it please the court. I want to start where the court questioned Mr. Ellenwood. And that's as to the prior criminal conviction. And I wanted to raise three specific points to that. Number one, there's no question that this brought into trial a similar offense, a prior Title 26 criminal tax conviction from 2002. This court's precedent in Hernandez-Sanders, district court precedent in Chinn, basically says that that should be introduced sparingly if at all. Yeah, but you're talking about a 404B type of analysis. This is a case where there was charged misrepresentations made to sell the program and that he lied about his earlier prosecution. It seems to me, I don't even know why it's an issue in the case myself based on the charges and the evidence in support of those charges. It's an issue because we raised this in documents 135 and 283 at the district court level, essentially in motions and limine. And the reason why, your honor, is because the district court basically said this is only admissible to establish evidence of quote, unquote, lulling. I was convicted of a crime. I got your back. Those kinds of things. That's evidence. And if the court admitted it for that purpose, that's fine. But the point is that it is part of the charged conduct. Over our objection, we moved at every possible stage. Of course, but you would object to every charge. I mean, the charge in this case was that he lied about the scheme and seduced clients, customers. And there's actual testimony to that effect. Here's the problem, your honor. The only witnesses questioned about this were Rose, Bair, and Damian Novak. Not a single one of them testified to lulling. So the government has continued, even on appeal, to say that's what it's admissible for. That's why it's in the indictment. Not a single one of those witnesses. Didn't they say things like it gave me some comfort or it reassured me? I don't know. They used words that, to me, sounded a lot like lulling. Not, your honor, through the typical lulling. I was trial counsel on the case. Did they testify in the way that Judge Rushing just recounted, that they felt comforted by him saying he's fiercely loyal to his clients? Not tied to the criminal conviction, your honor, and to the 2002 conviction. Tied to his misstatements about it. Not tied to any misstatements about it, your honor. I would specifically, I know I'm out of time, but I would direct the court's attention to our opening brief when we actually go through Rose, Bair, and Novak's testimony. We cite specifically to the record in the joint appendix. Their testimony is clear that it doesn't actually do what the government characterizes them as doing. Okay. Thank you, your honor. All right. Mr. Dickhouse. Thank you, your honor. One quick thing with regard to the venue argument is that the Cabrales decision specifically, and this was adopted by Sterling, focused on where the conduct was done. It says venue may, essential acts may have happened, but where was the criminal act done? So where did Sholay, who's the person charged with the act, do the procuring in the Eastern District of Missouri? Never, and so never in the Western District. In fact, there was no evidence. There was some testimony that she had once visited on an unrelated matter, but no evidence that she'd ever done anything in the Western District of North Carolina. And the second part that's related to this, which I didn't address in the initial part with regard to the conspiracy, was when they charged the conspiracy, Sholay was not even a tax attorney until 2013, well after it had begun, and did not appear on any of the tax returns that were charged until 2016. Initially, when it was indicted, the government alleged that she had joined into an agreement, although no evidence was produced on this trial, to market an illegal plan, the Gain Elimination Plan. However, at trial, the government's own expert witness said, Gain Elimination Plans are not per se illegal, but the plans charged here were improper. So there was no proof that she ever agreed to commit an illegal act in the implementation, which was the change strategy, which is why we argue that the indictment was amended and the basis on which she could be convicted expanded beyond the Fifth Amendment's Grand Jury Clause. And in addition to that, as the government proudly crowed to trial, she had a Gain Elimination Plan herself. It was never civilly challenged. No deduction was ever disallowed. It was not criminally charged. It had a signed partnership agreement. In other words, the evidence suggested- But that's just arguing the evidence. In other words, the structure of the tax plan might have been upheld as an appropriate shelter if it had economic substance. But this one, the government didn't challenge the structure. They challenged the economic substance of the plan because there were no services provided. There's no intellectual property provided. There's no cash changed hands, no payments made. They were all fictional. And that was the problem with these particular terms. Now, if she used the same structure for something, maybe she had legitimate payments. But the government's position isn't that the structure was wrong. The government's argument is that it was all made up. Well, the government's argument on indictment was that the structure was wrong. The government's argument going into trial was that the structure was wrong. When their witness testified, oh no, the structure itself isn't wrong, they pivoted, which to me represents an issue because it's an expansion of the basis of appeal. And what I'm saying is they made these allegations about economic substance despite the fact that these were charitable gifts. All of the testimony established that there was insurance actually in place and in force that would guarantee that these gifts would be made to the charities and therefore that they would be entitled to deduct them. The government used a proxy witness. They used Ricketts as a proxy witness. They wouldn't allow someone from INSC or they wouldn't call somebody from INSC to testify about what INSC knew. So Ricketts was able to attribute to them things and then not be cross-examined or confronted by the defendants as to what INSC's position was. It sounds like a new issue. Well, no, I'm just saying we raised this in the briefing that he was a proxy witness and so there wasn't evidence to support this idea that these things weren't valid. And in fact, INSC, we were all here because they sued previous people for not making the gifts and they won. And so all of these charitable gifts were actually made. Thank you. Thank you. Yes, sir. We'll adjourn court for the day and come down into Greek Council. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Allison J. Rushing